## BRADY et al. v. GULF, C. & S. F. RY. CO.
### No. 7899.

Court of Civil Appeals of Texas. Austin.
April 18, 1934.

Rehearing Denied May 9, 1934.

M. G. Cox, of Cameron, and E. A. Camp, of Rockdale, for appellants.

Terry, Cavin & Mills, of Galveston, W. G. Gillis, of Cameron, and Duff & Cecil, of Beaumont, for appellee.

BAUGH, Justice.

Suit was by the mother, widow, and children of Reagan B. Brady, deceased, against the railway company for damages for negligently causing the death of Reagan B. Brady. Trial was to a jury upon special issues, and based upon their answers thereto, the trial court rendered judgment for the defendant, from which the plaintiffs have appealed.

The case arose as follows:

Some time in October, 1930, the freight depot of the railway company at Cameron was broken into and a quantity of groceries stolen therefrom. The sheriff's department of Milam county was notified, and acquired information from the nightwatchman of the city of Cameron casting suspicion upon two negroes. On October 28, 1930, one J. E. Dunman, who held a commission from the state as a special ranger, an employee in the Special Service Department of the railway company, came to Cameron to attempt to ferret out the crime and recover the stolen property. He went to the sheriff's office for that purpose. After the sheriff had secured search warrants for the houses of the two suspected negroes, two deputy sheriffs, Pope and Robinson, accompanied by Dunman, went in the sheriff's automobile to the home of the negroes, searched them, but failed to find the missing property. Then, at the suggestion of Pope, who had charge of the search, they went to the home of Brady, who operated a small grocery store in the front part of his residence, located in the outskirts of Cameron, to ascertain if any one had offered to him for sale any groceries of the character stolen; or to see if he could give them any information or clue which might lead to the apprehension of the guilty parties. Pope was driving the car. They stopped in front of Brady's place, a lot 80x80 feet with the house on the north side of the lot, facing east, a lawn to the south of the house, and a garage on the southwest corner at the rear. A lattice work screened with shrubbery extended from the rear of the residence parallel with the street, to the front of the garage, which was situated some 60 feet from the street. When the officers approached, Brady was working in his back yard between the house and the garage, and just before or about the time the car stopped was seen to walk casually towards and into the garage. Pope and Dunman alighted from the car and walked down the driveway towards the garage, the doors of which were closed, to interview Brady. When a few feet from the garage, without warning, and with no one having spoken, a shotgun barrel emerged from between the closed doors and Pope was killed. Thereupon, Dunman

jumped to the side of the driveway against the front of the garage, drew his pistol, and was moving towards the entrance of the garage when the barrel of the gun again emerged between the doors and Dunman was killed instantly. Thereupon, Brady came out of the garage, discovered Robinson, the other deputy sheriff, sitting in the rear seat of the automobile in the street, and immediately fired at him, one shot striking Robinson in the left hand. Robinson alighted on the opposite side of the car and returned the fire with his pistol, shooting underneath the car. Each fired four shots at the other, and one of Robinson's shots took effect in Brady's neck. No word passed between them. Robinson then withdrew, went to his home about 1½ blocks away, telephoned the sheriff's office, and returned to Brady's place. Meantime the city marshal had been notified and had come to Brady's place before Robinson returned, and had endeavored to persuade Brady to surrender. Brady refused to give up or to leave the premises. Shortly after Robinson returned, another deputy sheriff arrived, requested Brady to surrender, assuring him that if he did so he would be protected; but Brady refused, saying that he would kill himself first. Confronted by these three officers, Brady, then standing near the corner of his residence in his back yard, remarked, "This is the end of me, anyhow," or, "I'd rather do it this way," immediately killed himself with his own gun.

The theory upon which this suit was predicated and the contentions made on this appeal are: That the trip to Brady's place was a joint enterprise of Pope, Dunman, and Robinson, engaged in at the instance of Dunman acting in his capacity as agent and employee of the railway company; that they were trespassers upon Brady's premises without his consent, and as such joint tortfeasors; that by approaching Brady's garage they in effect falsely imprisoned him, caused him to believe his life was in danger, and justified his conduct in shooting Pope; that after Pope was killed Dunman knew he was not wanted on the premises and should have withdrawn from the premises; that after Pope and Dunman had been killed, Robinson continued to prosecute as a joint tort-feasor the unlawful trespass launched at the instance of Dunman on behalf of the railway company, wounding Brady mortally; that as a result of such wound, and the anguish and suffering caused thereby, Brady was caused to take his own life as the result of such unlawful conduct of said officers upon his premises without legal process, for all of which the railway company was liable in damages.

In response to the special issues submitted, the jury found:

1. That Dunman, Pope, and Robinson associated themselves together in the joint and common enterprise of attempting to locate and discover property belonging to the defendant railway company;

2. That at the time of the tragedy they were not acting for and on behalf of the defendant railway company;

3. That the act of Dunman in proceeding towards Brady, after Pope had been shot, was not wrongful;

4. That after Pope and Dunman had been shot Robinson did not continue to act in a common and joint enterprise;

5. That the plaintiffs had not been damaged on account of the death of Brady; and

6. That they were not entitled to exemplary damages.

Appellants present thirty-six propositions and numerous authorities in support of the grounds of recovery on which said suit was predicated, insisting that as a matter of law they were entitled to a judgment under the evidence; complaining of the finding of the jury that plaintiffs had not been damaged by the death of Brady; and that the issue of whether the injuries inflicted upon Brady were a proximate cause of his taking his own life should have been submitted to the jury.

We shall not undertake to discuss these numerous propositions, nor the many authorities cited. It is now well settled that though an employee of a railway company has been commissioned as a peace officer of the state, the railway company is still liable for his torts or his negligence committed in the course of his employment. His position as a peace officer does not in itself render his master immune from liability if he acts within the scope of his employment. Texas & N. O. R. Co. v. Parsons, 102 Tex. 157, 113 S. W. 914, 132 Am. St. Rep. 857; Rucker v. Barker, 108 Tex. 280, 192 S. W. 528; Hudson v. St. Louis Southwestern R. Co. (Tex. Com. App.) 293 S. W. 811; 29 Tex. Jur. 424, and cases cited. But where he acts strictly in his capacity as a peace officer the rule is otherwise. Many of the cases cited and relied upon by appellants are instances where agents of the corporation, specially deputized, were acting of their own accord on the premises of their employer in ejecting trespassers from the premises, or

were acting unlawfully towards the injured party. In the instant case no such condition obtains. While the undisputed evidence shows, and the jury so found, that Dunman, Pope, and Robinson were engaged in a joint enterprise, it likewise shows that such enterprise was under the complete control and direction of the sheriff acting in his official capacity as a law enforcement officer. It was immaterial that at the particular time they were induced to do so at the instance of Dunman. That fact did not change its character. The search warrants for the negroes' premises were procured at the instance of the sheriff. The party was under the complete control of the sheriff and in his car. The trip to Brady's premises, entirely peaceful in character, was made at the instance of, and under the direction of, Pope, one of his deputies. Though Dunman was assisting, he had clearly placed himself at the disposal of the sheriff in the enterprise. He, so far as the record shows, did not know Brady and was not in any manner responsible for the immediate trip to Brady's premises. The question of the capacity in which the agent acts is usually one of fact for the jury. Lancaster v. Carter (Tex. Com. App.) 255 S. W. 392. In the instant case this issue was submitted to the jury who found that, at and immediately prior to the time of the tragedy, Dunman, Pope, and Robinson were not acting for and on behalf of the railway company. Even if it may not be said that the evidence conclusively showed that to be true as a matter of law, certainly the evidence was amply sufficient to sustain the jury finding. Under such circumstances, if it be granted that Pope and Dunman were technically trespassers on Brady's premises, such trespass is not chargeable to the railway company, and no liability was imposed by it. Under this finding, which was on an issue primarily material, the other findings of the jury become immaterial.

■ The evidence conclusively shows also that neither Dunman nor Pope inflicted any injury upon Brady. The only injury sustained by him was at the hands of Robinson. And even if it be granted that at the inception of the tragedy all three were acting in a joint enterprise, it is undisputed that Robinson had not left the car standing in the street and had never entered upon Brady's premises. Nor was he in charge of the undertaking. If, after Dunman and Pope had been killed by Brady, Robinson had entered the premises or had himself made an attack upon Brady, a different question would be presented. But as soon as Brady emerged from the garage and discovered Robinson in the car on the street, he immediately opened fire upon and injured him. What Robinson would have done had Brady not first attacked him may be a matter of conjecture or speculation. As it was, however, he had but two alternatives —to defend himself, or to flee. He chose the former, and the facts and circumstances, together with his own testimony, were clearly sufficient to sustain the jury finding that in doing so he did not continue "to act in a common and joint enterprise." Rather, he was acting, at the time of Brady's injury, in his own defense against a situation precipitated by the unwarranted action of Brady himself, a new and intervening cause, for which the railway company could not be held responsible.

It is a settled rule of law that one who unlawfully precipitates a controversy, making it necessary to defend himself, cannot after having done so exonerate himself by a claim of self-defense against a condition of his own making. Appellants urge this rule laid down in Gray v. Phillips, 54 Tex. Civ. App. 148, 117 S. W. 870, and in numerous other cases, as controlling here. Clearly it is not applicable. The mission to Brady's place was entirely peaceful, and no wrongful act was contemplated or intended by any of said officers. There was, we think, no reasonable provocation of Brady's action which could justify his attack on Robinson; and certainly none which could deny to Robinson his right to defend himself.

While numerous authorities are cited and reviewed by appellants in support of their contentions, and they urge that they are entitled to recover against appellee as a matter of law under the facts and circumstances above stated, irrespective of the jury findings, we think the matters above stated conclusively dispose of the case. The jury finding, amply supported by the testimony, in effect that the enterprise was not that of the railway company, but that of the peace officers acting in their official capacity, bars any recovery against the appellee; and other matters therefore become immaterial. The judgment of the trial court will therefore be affirmed.

Affirmed.